UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
MANSOOR ALAM,                                    Case No.: 07-cv-3540 (LTS)(JCF)
                                                 ECF Filed
            Plaintiff,

                                                 **RULE 56.1 STATEMENT**
     v.                                          **OF MATERIAL FACTS**

HSBC BANK USA, N.A.,

            Defendant.
------------------------------------------------------------------X

      1.      Mansoor Alam ("Alam") was hired by Republic National Bank of New York in 1998.  Complaint at 1.[1]  Republic merged with HSBC effective January 1, 2000.  Complaint at 1.  After the merger, Alam became an employee of HSBC.  Choi ¶4.[2]

      2.      Alam worked in HSBC's Trade Services Operations ("TSO") department from 2000 to 2005 as a document examiner.  Complaint at 1; Choi ¶7.  From 2000 to 2002 he worked in the Exports department and from 2002 to 2005 he worked in the Imports department.  Choi ¶¶5, 7.

      3.      TSO processes trade documentation covering the financing of import and export transactions.  Wright ¶4.[3]

      4.      The role of a document examiner is to examine presentations made under an export or import letter of credit.  Eustaquio ¶5.[4]  The examiner must compare the documents submitted by the beneficiary seeking payment under the letter of credit to the letter of credit (and

---

[1] All references to the Complaint shall be as "Complaint at __"
[2] All references to the Affidavit of K.P. Choi shall be as "Choi ¶__"
[3] All references to the Affidavit of Ian Wright shall be as "Wright ¶__"
[4] All references to the Affidavit of Sylvia Eustaquio shall be as "Eustaquio ¶__"

any amendments thereto) itself and discern any discrepancies between the documents and the letter of credit's requirements.  Eustaquio ¶¶5, 6.

   5. HSBC reviews its employees' performance twice a year – once at mid-year and again at year-end.  Employees are rated on a scale of 1 to 5 with 1 being the best and 5 the worst.  Wright ¶12.

   6. While Alam was working in Exports he reported to Ashok Vapiwala.  Eustaquio ¶12; Alam Dep.[5] at 8-9.  In 2001 Vapiwala rated Alam a "3" and commented that Alam needed "improvement … on quantity of production on consistent basis" and "need to improve quality and to be very careful in handling the documents to avoid repeatation [sic] of incident of June 2001."  Eustaquio ¶13, Ex. B; Choi ¶5.

   7. When Alam began working in Imports in 2002 he reported to Hema Nayampalli.  Eustaquio ¶¶8, 14.  Nayampalli reported to Sylvia Eustaquio ("Eustaquio").  Eustaquio ¶8.

   8. Eustaquio is employed by HSBC as a Vice President and Manager of TSO's Imports department.  Eustaquio ¶2.  She manages a department of approximately 20 employees.  Id.  In 2005 she managed a department of approximately 45 employees.  Id.

   9. In 2002 Nayampalli rated Alam a "3" at his year-end review.  Eustaquio ¶10, Ex. A.  Nayampalli commented in the review that Alam was "reluctant to help other[s] … improvement is required to ensure he works as a team player with the import department."  Eustaquio ¶11, Ex. A.

---

[5] All references to Plaintiff's deposition transcript shall be as "Alam Dep. at __"

2

10. Alam's response to Nayampalli's comments was to blame his prior manager, Ashok Vapiwala, and accuse him of a "gross injustice" and "violat[ing] HSBC code of ethics". Eustaquio ¶12, Ex. A.

11. Eustaquio signed off on the review as Head of the department. Eustaquio ¶10.

12. In June 2003 Nayampalli retired and K.P. Choi assumed her management role within TSO. Eustaquio ¶14.

13. Choi had been employed by HSBC and its predecessors since 1984 in TSO. Choi ¶3. Choi managed a subsection of Eustaquio's Imports department. Choi ¶2. Prior to taking over for Nayampalli Choi had very little interaction with Alam. Choi ¶¶3, 7.

14. In October 2003 Choi prepared Alam's year-end review and gave Alam a "3" rating. Choi ¶9, Ex. A.

15. Alam was not entitled to a 360-degree evaluation which if given at all was given to senior management only, at the Senior Vice President level or higher. Wright ¶13, FN2.

16. In early 2004 Eustaquio began receiving complaints regarding Alam. Eustaquio ¶15. Specifically, the complaints concerned the fact that Alam was often away from his desk for extended periods of time. Id.

17. As a result, on May 5, 2004 Eustaquio and Choi met with Alam to discuss his lengthy absences from his desk. Eustaquio ¶16; Choi ¶11. During the meeting Alam stated that he visited the 14th floor, which contained the Exports department, for work purposes. Id. Alam also admitted that he went to the 14th floor to visit with some of his friends there. Eustaquio ¶16.

3

18.     The Head of Exports, Bruce Sparke, also complained that Alam's socializing on his floor was having a negative effect on the productivity of the Exports department.  Wright ¶40.

19.     Eustaquio and Choi informed Alam that he should not be socializing during work hours.  Eustaquio ¶17; Choi ¶12.  Eustaquio told Alam that he needed to advise Choi when he would be gone for an extended period of time.  Eustaquio ¶18.  Eustaquio and Choi told Alam that he should use his breaks and lunch hour to conduct errands and socializing.  Eustaquio ¶18; Choi ¶13.

20.     At least twice after that meeting Alam left the office during working hours to conduct personal errands.  Eustaquio ¶21; Choi ¶¶16, 18.

21.     As of June 2005 Alam already had made 17 errors in his work in comparison to the 10 errors he had made in all of 2004.  Eustaquio ¶38, Ex. H.

22.     On July 29, 2004 Alam and Choi had an incident when Choi inquired as to Alam's whereabouts after Alam had been away from his desk for a prolonged absence.  Choi ¶22.  Choi instructed Alam to speak with Eustaquio, and Alam refused.  Choi ¶¶23, 25; Eustaquio ¶¶23-24.

23.     Alam eventually went to Eustaquio's office and began to yell at her.  Eustaquio ¶25.  Eustaquio asked Alam where he had been, and Alam advised that he had been on the 14th floor visiting with another employee.  Id.  Eustaquio advised Alam that he should use his free time to socialize and not working hours.  Id.  Alam responded by yelling at Eustaquio and accusing her of singling him out.  Id.  Alam stated he did not think it was fair that he should have to report his whereabouts to Choi.  Id.  Eustaquio told Alam he was the only one not following instructions.  Id.

4

24. When Alam returned to his desk Eustaquio followed him there and advised him that he should not have yelled at her and any further outbursts would result in corrective action. Eustaquio ¶27.

25. In August 2004 Choi met with Alam to discuss Alam's 2004 mid-year review. Choi ¶¶28-29. They discussed Alam's failure to assist the other members of his team and his need to pay closer attention to work matters. Choi ¶30.

26. On September 17, 2004 Eustaquio and Choi met with Alam to discuss several errors Alam had made in reviewing documents submitted under letters of credit. Eustaquio ¶29; Choi ¶32. Eustaquio and Choi advised Alam that he had made too many errors and was not performing up to HSBC's standards. Eustaquio ¶29; Choi ¶¶32-33.

27. In February 2005 Choi delivered Alam's 2004 year-end review which he had begun to prepare in December 2004. Choi ¶¶36, 45. Alam was rated a "4" for 2004. Choi ¶44, Ex. F.

28. Eustaquio's comments were that Mansoor had been given several verbal warnings concerning the quality of his work and was advised to improve his performance but did not. Eustaquio ¶33, Ex. G.

29. Choi's comments were that Alam should improve in his dedication, interaction, cooperation, and initiative. Choi ¶44, Ex. F. Choi also wrote that Alam had been given a verbal warning regarding the quality of his document examination and was advised to improve it. Choi Ex. F.

30. Alam responded to his annual review with a memo directed to Javier Evans of Human Resources, copied to Ian Wright, the Head of TSO, in which he denied the

5

legitimacy of the review and accused Choi of fabricating the performance issues. Wright ¶47, Ex. K.

31. In February 2005 Choi sent Alam an email regarding his work quality and advised Alam that he was making more errors than his co-workers. Choi ¶52, Ex. I; Eustaquio ¶37.

32. In response to the email Alam sent Choi a memo in which he admitted to making errors but said that "mistakes happen". Choi ¶55, Ex. J. He denied statements made by Choi and said that Choi's email had been a "sham" designed to make Alam look bad. Id. He claimed that Choi did not know the truth about who was making more errors than others in the department, and dismissed Choi's concerns for violating bank policy. Id.

33. In March 2005 Choi advised Eustaquio that Alam had failed to scan certain documents presented under a letter of credit to check for Office of Foreign Asset Control ("OFAC") hits against the names of third party shippers. Choi ¶¶56-61.

34. On March 30, 2005 Alam met with Wright to discuss his 2004 year-end review and other issues. Wright ¶42. Wright is employed by HSBC as a Senior Vice President and has been Head of TSO since 2002. Wright ¶2.

35. During the meeting Alam stated he felt there was a "conspiracy" against him since 2001 when he had a problem with Syed Ahmad, his previous manager. Wright ¶43. Wright advised Alam that he knew nothing of that incident since it preceded his arrival to TSO. Id. Alam asked Wright to change his 2004 rating to a "3", but Wright responded that he would not based upon Alam's manager's comments about his performance. Id.

6

36. Alam then stated that he had worked at "much better banks" and had received higher ratings working for "much better managers" and that he felt he was unable to use his customer relations skills in his current position. Wright ¶44.

37. Wright advised Alam that if he was unhappy with his position he was free to post for another position within HSBC. Wright ¶45. Although Alam thought this meant to leave the Bank Wright stated that he meant there were several open job requisitions within HSBC and he encouraged Alam to review them. Id.

38. Wright also told Alam that if he had witnessed the July 29 incident between Alam and Eustaquio Wright would not have tolerated such behavior and would have sent Alam to Human Resources. Wright ¶46.

39. In 2005 Wright had six (6) direct reports – (i) Sylvia Eustaquio, head of Imports; (ii) Bruce Sparke, head of Exports; (iii) Juda Israel, head of Stand-bys; (iv) Denise Edwards, head of Collections; (v) Susan Morales Campbell, head of Compliance; and (vi) Claudette Stultz, head of Support Management. Wright ¶11.

40. Since becoming Head of TSO in 2002 Wright has met with his six reports on a weekly basis. Wright ¶12.

41. Since 2002 TSO's workforce has decreased from well over 100 employees to just over 70 today through natural attrition and reductions in force ("RIFs"). Wright ¶5. TSO has shrunk in order to match the demands of the trade industry. Wright ¶6. The downsizing of traditional trade instruments, such as letters of credit, has reduced the volume of transactions. Id. In addition, many financial institutions have moved their trade processing to off-shore locations. Id. Finally, the business world in general has become more reliant upon improved technology requiring fewer personnel. Id.

42.     As Head of TSO Wright monitors the transaction volume of the department.  Wright ¶7, Ex. A.  In 2005 the Imports department conducted a total of 52,672 transactions which was 16.7% less than the prior year (2004).  Id.

43.     Wright also tracks the TSO department's efficiency ratio on a monthly basis.  Wright ¶9.  The efficiency ratio is calculated using the time it takes to process transactions received each month compared against the number of staff.  Id.  HSBC's TSO department is judged in part by its efficiency ratio.  Wright ¶9.

44.     In the spring of 2005 TSO's efficiency ratio had decreased indicating that its work volume had decreased.  Wright ¶10.

45.     In early 2005 Wright determined that the department would have to RIF five (5) employees to improve the TSO efficiency ratio by 4%.  Wright ¶12.  He advised his team of direct reports during one of their weekly meetings and told them that TSO would RIF its lowest rated employees.  Wright ¶12.

46.     HSBC evaluates its employees twice each year, once at the mid-year point and again at year-end.  Its employees are ranked on a scale of 1 to 5, with 1 being the best and 5 the worst.  Wright ¶13.

47.     In 2005 TSO had seven (7) employees who had been rated a "4" for their 2004 year-end reviews: Veronica Maloney, Aftab Mirza, Mansoor Alam, Wilber Mezzich, Ernst Martelly, Domingo Gonzalez, and Sandy Wu.  Wright ¶13, Ex. B.

48.     Of the seven "4" rated employees, three worked in Imports under Sylvia Eustaquio – Sandy Wu, Mansoor Alam, and Wilber Mezzich; three worked in Exports under Bruce Sparke – Aftab Mirza, Ernst Martelly, and Veronica Maloney; and one worked in Support Management under Claudette Stultz – Domingo Gonzalez.  Wright ¶14.

8

49. Wright informed Eustaquio and Sparke that they needed to identify which of their three "4" rated employees would be RIF'd and who would remain. Wright ¶15. Eustaquio informed Wright that Sandy Wu would remain, and Sparke advised that Ernst Martelly would remain. Wright ¶15.

50. Both Eustaquio and Sparke reported to Wright that Wu and Martelly had shown improved work performances since receiving their 2004 year-end reviews. Wright ¶16.

51. In July 2005 Wright sent a memorandum to his manager, Michael Papadatos, requesting permission to RIF five employees. Wright ¶19, Ex. E. The memorandum advised Papadatos of the need to conduct a RIF due to the decreased efficiency ratio and a decrease in trade services business. Id. The memorandum further advised that the sole selection criteria used for the RIF would be performance evaluations from the previous year. Papadatos approved the RIF. Wright ¶¶19-20.

52. On August 5, 2005 the five "4" rated employees were terminated. Wright ¶20.

53. At the time of his termination Alam's title was Operations Specialist. He was not an Officer. Wright ¶22.

54. In connection with the RIF HSBC ran an adverse impact report. Wright ¶24, Ex. F. The adverse impact reflected that 95% of the workers in TSO were over the age of 40 both before and after the RIF. Wright ¶24. The report also reflects that 60% of TSO employees were over the age of 50 at the time of the RIF. Id.

55. In addition, prior to the RIF 55% of HSBC's TSO department was Asian, and after the RIF the number was 53%. Wright ¶25, FN4. Alam is categorized as Asian. Id.

56. As part of the RIF, HSBC terminated two Asians, two Hispanics, and one African-American. All were over the age of 40. Wright ¶25, Ex. F.

57. HSBC has not hired anyone to replace any of the five individuals who were RIF'd in 2005. Wright ¶28.

58. Alam was not replaced by Marvin Lee. Wright ¶29. Lee has been a negotiator in the Imports department who started working for TSO as far back as 2002 and still is employed by HSBC today. Id. When HSBC conducted the RIF the work that the terminated employees, including Alam, would otherwise have handled was redistributed to the other employees in the department. Id.

59. In 2005 two other TSO employees retired or voluntarily resigned – Pamela Partab and Cecilia Santos. Wright ¶31. In early 2006 three other employees, Pennie Barnwell, Juda Israel and Barbara Marrone, retired. Id.

60. HSBC did not post for replacements for either Barnwell or Marrone. Wright ¶33. HSBC did post for replacements for Partab, Santos and Israel. Wright ¶33, Ex. G. Although HSBC posted for replacements, no one was interviewed or hired for the Partab and Santos replacements. Wright ¶31.

61. In 2006 TSO hired two individuals from the outside – K.C. Yiu and Vincent Urban. Wright ¶34. Yiu was hired as a Vice President and manager of TSO's Stand-bys department to replace Juda Israel. Wright ¶32.

62. Vincent Urban was hired as a file clerk in February 2006. Wright ¶34. Prior to 2006 Urban had temped for HSBC twice for several months at a time and had a prior knowledge of the department and the procedures. Id. His job was to perform ministerial and

10

administrative tasks for TSO.  Id.  In 2008 Urban was promoted to Trade Operations Specialist working in the Stand-bys department.  Id.

63.     Israel, Santos, Barnwell, and Marrone were Officers of HSBC, and Alam was not.  Wright ¶37.  Officers do not always have supervisory responsibility but they do have approval authority whereas a negotiator is considered clerical with no supervisory or approval ability.  Id.  Alam was not qualified for any of those positions.  Id.

64.     There was approximately the same number of printers in TSO as there are today.  Wright ¶39.  Other employees in TSO have printers near or at their workstations similar to Alam.  Id., Ex. I.  Those employees who have printers at or near their desks have never complained that a printer caused so much distraction.  Id.

65.     Alam stated he found pictures of terrorists such as Osama Bin Laden on his desk from time to time but never informed Human Resources.  Complaint at 2; Alam Dep. at 12.

66.     Alam never told Wright about the pictures.  Alam Dep. at 12.

67.     Alam only told Choi about some of the pictures, but not all.  Alam Dep. at 11.  Alam stated that Choi told him to throw the pictures away.  Alam Dep. at 12.

68.     Alam testified that Eustaquio never made any comments to him about his age or his religion.  Alam Dep. at 40.

69.     When Alam met with Wright in March 2005 he did not advise Wright of the fact that he had found pictures of terrorists on his desk.  Wright ¶41.

70.     Alam alleges that Bruce Sparke commented once that "he could not put up with so many Muslims in the department."  Alam Dep. at 20.

11

       71.     Alam testified that no one at HSBC made comments to him about his age. Alam Dep. at 37.

       72.     Bruce Sparke was Head of Exports. Wright ¶11. Alam never reported to him. Alam Dep. at 8-9.

Dated: New York, New York
       October 31, 2008

                   HSBC Bank USA, National Association

                   By: /s/ Meredith L. Friedman
                      Meredith L. Friedman (MF 8464)
                      452 Fifth Avenue
                      7th Floor
                      New York, NY 10018
                      (212) 525-5000

TO:    Mansoor Alam
        Plaintiff *Pro Se*
        32 Clifton Street
        Farmingdale, NY 11735